UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

HARRY L. GOODRICH
and AGNES P. GOODRICH,

        Plaintiffs,

v.                                 ACTION NO.  4:17cv9

JOHN CRANE, INC.,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

    This matter comes before the Court on plaintiffs' motion *in limine* to exclude evidence and testimony regarding the alleged knowledge or negligence of the Navy.  ECF No. 72.  This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.  The Court has determined that a portion of plaintiffs' motion should be treated as one for partial summary judgment.  That portion will be addressed by this report and recommendation, and an accompanying opinion and order issues this same day addressing the remaining portions of plaintiffs' motion.  For the following reasons, the Court **RECOMMENDS** that plaintiffs' motion be **GRANTED**.

## I.    PROCEDURAL HISTORY

    On February 2, 2017, plaintiffs Harry L. Goodrich and Agnes P. Goodrich ("plaintiffs") filed a four-count complaint against five defendants, including John Crane, Inc. ("JCI").  Compl., ECF No. 1.  The complaint alleges that, while serving in the United States Navy from June 23,

1959 to June 17, 1963, Harry Goodrich inhaled asbestos fibers, particles, and dust due to exposure to the defendants' asbestos-containing products, which caused him to contract malignant mesothelioma. Compl. ¶¶ 4, 26. The complaint seeks recovery for defendants' alleged negligence (count one) and strict liability in tort (count two), and for spousal, pre-death loss of society and consortium (count three). Compl. ¶¶ 27–38.[1] JCI, the only remaining defendant,[2] answered the complaint on February 24, 2017. ECF No. 10.

On May 26, 2017, plaintiffs filed a motion for partial summary judgment on JCI's statute of limitations defenses. ECF No. 28. On October 10, 2017, plaintiffs filed a motion for leave to file an additional motion for partial summary judgment, a memorandum supporting the motion for leave, and the requested motion for partial summary judgment with supporting memorandum. ECF Nos. 53–56. The proposed motion sought summary judgment on JCI's sophisticated purchaser, government contractor, and intervening negligence/superseding cause defenses. ECF No. 56. On January 12, 2018, Goodrich filed a motion *in limine* to exclude evidence and testimony regarding the Navy's knowledge or negligence, with supporting memorandum. ECF Nos. 72, 103. The plaintiffs' legal arguments in their motion *in limine* are identical to those asserted in their motion for partial summary judgment. *See* ECF Nos. 56, 103.

On January 18, 2018, the Court issued an order granting plaintiffs' first motion for partial summary judgment (ECF No. 28) and denying a motion for summary judgment filed by JCI (ECF No. 51). ECF No. 107. In its order, the Court stayed consideration of plaintiffs' motion for leave until after completion of a settlement conference. *Id.* at 9.

---

[1] Count four of the complaint, entitled "Conclusion," does not allege an additional theory of recovery and is comprised of four numbered paragraphs and an *ad damnum* clause. Compl. ¶¶ 39–42.

[2] Due to negotiated settlements and the filing of stipulations of dismissals against the other four defendants, JCI is the only remaining defendant in the case. ECF Nos. 42, 49, 61, 63, 65–66.

On March 14, 2018, the Court denied plaintiffs' motion for leave, finding the arguments raised in their motion for partial summary judgment (ECF No. 55) to be duplicative of the arguments raised in their motion *in limine* (ECF No. 72).   ECF No. 109.   Upon further consideration, the Court has decided to treat the motion *in limine* as one for partial summary judgment. *See Goodman v. Praxair Servs., Inc.*, No. MJG-04-391, 2009 WL 10681955, at *1 (D. Md. June 16, 2009) (treating motion *in limine* to exclude an affirmative defense as a motion for partial summary judgment).   The Court held a telephonic conference on July 31, 2018, where the Court gave notice to the parties of its intention.   The Court also issued an order on July 31, 2018 directing Goodrich to file a statement of undisputed facts, and directing JCI to respond with a statement listing all material facts as to which it contends there is a genuine dispute.   ECF No. 149.   Goodrich complied on August 1, 2018, with attached exhibits.[3]   ECF No. 150.   JCI complied on August 7, 2018, with attached exhibits.   ECF No. 151.

On July 12, 2018, in response to another Court order (ECF No. 147), JCI advised the Court that it does not intend to pursue the government contractor defense at trial.   ECF No. 148.

## II.   FACTUAL BACKGROUND

### A. The Allegations Against JCI

The following general factual background is drawn from the complaint, the Court's January 18, 2018 summary judgment ruling, and various filings made by the parties.   The Court has noted those facts that are in dispute, and takes the facts in the light most favorable to JCI, the non-moving party.   Harry Goodrich served in the Navy for approximately four years, from 1959 to 1963, and worked as a fireman apprentice, a fireman, a machinist's mate, and a boiler tender.

---

[3] Goodrich's motion for partial summary judgment on JCI's defenses included 30 exhibits.   ECF No. 56.   Goodrich's latest statement of undisputed facts attached the first 23 exhibits from the prior motion.   ECF No. 150.

Compl. ¶ 13; ECF No. 29 at 5; ECF No. 107 at 1.  After attending basic training, Goodrich[4] served as a crewmember:  (1) on a destroyer, the USS Corry (DDR-817), from approximately September 1959 to June 1961; (2) on another destroyer, the USS Harlan Dickson (DD-708) from approximately July 1961 to September 1962; and (3) on a destroyer tender, the USS Yosemite (AD-19) from September 1962 to June 1963.  ECF No. 69-5 at 9–12; ECF No. 29-5 at 24.  Goodrich separated from the Navy on June 17, 1963 as a machinist's mate, third class.  ECF No. 29-5 at 16.

The complaint alleges that, while in the Navy, Goodrich "was continuously and daily required to install, remove, repair, alter, fabricate, work with, use, handle and/or otherwise come into contact with and/or to be exposed to [the defendants'] asbestos-containing products," which led to his "inhalation of asbestos dust, fibers, and/or particles" and the contamination of his clothes, person, and belongings with the same.  Compl. ¶ 26.  Goodrich contends that the aforementioned products included gaskets and packing manufactured by JCI that contained chrysotile asbestos.  ECF No. 99 at 3.  Goodrich alleges that his work with such products "directly and proximately caused [him] to contract malignant mesothelioma,[5] which is permanent and/or fatal."  Compl. ¶¶ 29, 33.

According to a March 7, 2017 affidavit filed by Goodrich in support of plaintiffs' earlier motion for summary judgment, a series of medical scans from 2010 to 2012, as well as a biopsy, revealed evidence of non-malignant lung conditions, including "calcified pleural plaques bilaterally, mild," suggestive of "mild asbestos exposure."  ECF No. 29-5 at 2–3, 5.

---

[4] Unless otherwise noted, all references to Goodrich hereafter refer to Harry Goodrich, rather than fellow plaintiff Agnes Goodrich or witness Barry Goodrich, Harry's brother who also served in the Navy and onboard the USS Corry.  ECF No. 90-2 at 3.

[5] In *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 142 (2003), the Supreme Court defined "mesothelioma" as "a fatal cancer of the lining of the lung or abdominal cavity."

On May 22, 2012, Goodrich submitted a claim for disability benefits to the Department of Veterans Affairs ("VA") seeking benefits for "non-Hodgkins lymphoma, right lung wedge resection, and evidence of asbestos exposure in left lung, lung asbestos damage, pleural thickening and calcification in both lungs." *Id.* at 3, 15–18. In his VA application, Goodrich wrote:

> While in the Navy I was exposed to dry-powdered asbestos while in my duty station. We did repairs on pipes covered with asbestos & made new covers from asbestos. More than one person I served & worked with has died from asbestosis. I was a machinist mate in the engine room.
>
> My medical report from [January 2012] shows pleural thickening & calcification in the lungs from previous asbestos exposure. I have had a lump removed from the right lung (non-malignant)[.] I also have Non[-]Hodgkins lymphoma. Could be connected with asbestos.???

*Id.* at 18. On August 23, 2013, the VA: (1) granted Goodrich a 10% service-connected disability rating, effective June 5, 2012, for "pleural plaques due to [a]sbestos exposure, (claimed as lung damage and lung wedge, resection)"; (2) granted a 0% service-connected disability rating for "residual surgical scars, S/P right upper lung lobe apex wedge resection"; and (3) denied a service-connected disability for chronic obstructive pulmonary disease and Non-Hodgkin's Lymphoma.[6] *Id.* at 22. The complaint alleges that three years later, on September 2, 2016, Goodrich was diagnosed with malignant mesothelioma, "a debilitating and terminal condition with an average life expectancy of six to eighteen months." Compl. ¶¶ 14, 37; ECF No. 29-5 at 35. This condition is a "'separate and distinct disease' from pleural plaques." ECF No. 107 at 2.

**B. Facts Pertaining to the Navy's Alleged Knowledge or Negligence**

As above, the facts herein are recited in the light most favorable to JCI, the non-moving party. In 1945, the Manufacturing Chemists Association, Inc. ("MCA"), published "Warning

---

[6] Goodrich's affidavit indicates that his monthly VA benefit is $127.00. ECF No. 29-5 at 3, 28 (reflecting a cost of living adjustment to $129.00 per month effective December 1, 2012).

Labels: A Guide for the Preparation of Warning Labels for Hazardous Chemicals, Manual L-1."

("MCA L-1").[7]

The introduction to MCA L-1 states that "label information . . . cannot take the place of

the education of personnel regarding product hazards and the use of safety clothing and

equipment," and that such education is the "responsibility of . . . employers." ECF No. 151-8 at

6. It continues that "precautionary labels cannot be expected to cover complete information."

*Id.* The manual does however advise that the "most practical means" to disseminate information

about the hazards of a product is through "precautionary labels affixed to containers of hazardous

substances, bearing appropriate precautionary statements." *Id.* The manual goes on to define the

modes in which substances may be hazardous, which includes the following definition of dust:

"[s]olid particles generated by handling, crushing, grinding, rapid impact, detonation and

decrepitation of organic or inorganic materials such as rock, ore, metal, coal, wood, grain, etc."

ECF No. 150-3 at 14. A table showing sample warnings includes the following: "Materials in

Dust Form Hazardous from Inhalation or Contact."[8] *Id.* at 18. The manual does not speak about

asbestos specifically. *See generally id.*; ECF No. 151 at 5–6.

---

[7] The L-1 Manual was amended several times. Plaintiffs attached the 1953 version to their statement of undisputed facts. ECF No. 150-3. JCI objects to consideration of the 1953 version, because subsequent versions were published in 1956 and 1961, making those the versions in place during the course of Goodrich's Navy career. ECF No. 151 at 5. JCI attached "excerpts" of those versions to its statement of facts, in the form of the first few pages of each version. ECF Nos. 151-7, 151-8. Despite JCI's objection, it never claims that the subsequent versions of the manual are materially different as regards the definition of dust or the requirement to warn of hazards associated with dust. It also does not attach those portions of the 1956 or 1961 versions discussing dust. The Court has reviewed a 1961 version of the manual and has satisfied itself that the 1961 and the 1953 versions include identical definitions of "dust."

[8] David Rosner, Ph.D., a professor of the history of occupational health in the United States, stated in an affidavit his intention to testify that MCA L-1 "required warnings and minimum information regarding dangers from dusts," based on these recited sections. ECF No. 150-4 at 1–2, 29. Illinois, where JCI has been headquartered since the 1940s, adopted the MCA L-1 definition of dust and the requirement to warn of harmful dust in the Illinois Occupational Health

In 1951, the Department of Defense ("DOD") published MIL-STD-129B, Marking For Shipment and Storage, which incorporated MCA L-1 by reference. ECF No. 150-1 at 20–22. Specifically, MIL-STD-129B states:

> 2.2.10.4.3 Hazardous chemicals. All package units of hazardous chemicals to be ultimately issued to the consumer who may be exposed to such chemicals under conditions of ordinary use shall have affixed thereto such warning labels as may be required in accordance with [MCA L-1] or in accordance with appropriate [DOD] instructions as published which shall take precedence.

*Id.* at 22. There is no evidence that any shipment of asbestos-containing products from JCI to the Navy was ever returned or rejected as violating MIL-STD-129B. JCI has stated that George Springs, JCI's corporate representative, will testify that there is not a record of any return or rejection of JCI's products for violating this standard. ECF No. 151 at 9, 14–15.

In 1953, the Navy released MIL-A-17472, which outlined the specifications for compressed asbestos sheet gasket material that were in place during Goodrich's Navy service. *See* ECF Nos. 115-1, 150-9. MIL-A-17472 incorporated by reference MIL-STD-129 and provided that "shipments shall be marked in accordance with Standard MIL-STD-129." ECF No. 115-1 at 1, 7. MIL-A-17472 also specifies that compressed asbestos sheet shall contain not less than 70 percent chrysotile asbestos fiber. *Id.* at 2.

In 1956, the Navy issued a letter stating that labels to be affixed by the manufacturer are governed by state and federal laws and regulations and that most major manufacturers shall abide by MCA L-1. ECF No. 150-10. According to the plaintiffs, over the many years of Navy-related asbestos litigation, many individuals associated with the Navy have testified that Navy

---

Act, Part J, Rules and Regulations Relating to Labeling in the Use, Handling and Storage of Substances Harmful to the Health and Safety of Employees (June 15, 1951). ECF No. 150-5 at 2–5. JCI states that such law is irrelevant. ECF No. 151 at 7–8.

regulations did not prohibit manufacturers from affixing warnings to their products. ECF Nos. 150-11 at 1–3 (1985 testimony of Navy industrial hygienist, Kenneth Nelson), 150-12 at 1–3 (1979 testimony of Naval Ship Engineer Henry Murad), 150-13 at 1–3 (1979 testimony of the head of Naval Sea Systems Command's Packaging and Container Section, Alvin Anceravage). JCI retorts that such individuals have not been disclosed as witnesses in this case, that JCI was not a party to the suits in which they testified, and that JCI has had no opportunity to confront their testimony.[9] ECF No. 151 at 11–13.

In its eighth supplemental response to Goodrich's first set of interrogatories, JCI stated that there was no difference in the packaging of the asbestos-containing products that JCI sold to private industrial consumers and those products sold to the United States Government. ECF No. 150-14 at 7–8. JCI states in its response to interrogatories that "it first learned of the health hazards related to respirable asbestos in approximately 1970 from the general news media surrounding the passage of [the Occupational Safety and Health Act] and at a meeting of the Mechanical Packing Association." *Id.* at 4. JCI first began including warnings on its asbestos-containing products sold directly to the Navy in the 1980s. *Id.* at 2–3.

JCI has designated Captain Margaret McCloskey as its Navy expert in this case. In 2015, Captain McCloskey testified during a deposition in a different case brought against JCI that the Navy did not prevent manufacturers from providing warnings on the packaging provided to the Navy:

> Q. Paragraph 5.1.2, level C, see where it says, "Asbestos sheet shall be packaged in accordance with the supplier's standard practice?"
>
> A. Yes.

---

[9] *See* Fed. R. Civ. P. 56(c)(2) (stating that evidence presented in support of summary judgment must be capable of being presented in a form that would be admissible at trial).

> Q. If the supplier, in his normal standard practice, included a warning on the packaging this paragraph would allow the supplier to put a warning with the Navy packaging, too; correct?
>
> A. Yes.

ECF No. 150-21 at 2 (McCloskey Dep. in *Chapman v. John Crane, Inc., et al.*, No. CL14-01383P-03(DP) (Va. Cir. Aug. 4, 2015)). She testified that, as of 1957, the Navy was telling suppliers to include warnings on packaging for hazardous materials. *Id.* at 3. She further testified that, if MCA L-1 listed toxic dust as a hazardous chemical, warnings for toxic dust would be required. *Id.* She testified that there was not a consensus throughout the Navy that asbestos was dangerous until the 1970s.[10] *Id.* at 9–10. She testified that the Navy was initially concerned about the hazards of asbestos for those employees who were involved in mining asbestos, and then became concerned about the insulation workers who removed and installed asbestos, before becoming concerned about all workers who came into contact with asbestos. ECF No. 151-14 at 2–3. This learning process occurred throughout the 1950s, 1960s, and 1970s. *Id.* She also clarified that she was not contending that the Navy knew about the hazards of asbestos. ECF No. 150-21 at 160.

In yet another case, Captain McCloskey testified that to the extent there were warnings about the dangers of asbestos, she would have obeyed those warnings and required her subordinates to also obey those warnings. ECF No. 150-22 at 5 (McCloskey Dep. in *Parker, et al. v. John Crane, Inc., et al.*, No. CL14-02913F-15(TF) (Va. Cir. Dec. 21, 2015)).

Captain McCloskey filed an expert report in this case. ECF No. 114-15. In her report, Captain McCloskey states that she will offer, as an expert opinion, that "[t]he United States Navy had knowledge of the health hazards associated with asbestos-containing insulation materials

---

[10] JCI objects to the McCloskey testimony presented above, and states that McCloskey has not been designated as an expert on warning labels in this case. ECF No. 151 at 15–17.

during the relevant time period, and did not consider asbestos-containing gaskets and packing to present a significant risk of exposure." *Id.* at 7. Captain McCloskey further states that "[f]rom the 1940s through the 1970s, the Bureau of Medicine focused on the studies and data from the fabrication and installation of asbestos-containing thermal [insulation] products." *Id.* at 36. In 1939, the Navy published a study that documents the disease in the lungs which may result from asbestos. *See* ECF No. 151-15 at 2 (chronology prepared by Dr. Gerald Markowitz and plaintiffs' expert, Dr. David Rosner, discussing United States Navy Dept., Bureau of Medicine and Surgery, Annual Report of the Surgeon General, U.S. Navy, . . . Concerning Statistics of Diseases and Injuries in the United States Navy for the Calendar Year, 1939, U.S., GPO, 1941). Drs. Markowitz and Rosner further cite a 1943 Navy document recognizing that asbestos may cause industrial disease and that "any job in which asbestos dust is breathed" may be dangerous. *Id.* at 3 (citing U.S. Navy Dept., U.S. Maritime Commission, "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," Washington: GPO, 1943).

Finally, JCI cites to other Navy documents between 1922 and 1955 that purport to establish that the Navy was aware of the dangers of asbestos during that time period. *See* ECF Nos. 151-18–151-26.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment and directs a Court to grant such motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party "seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted). Subsequently, the burden shifts to the non-moving party to present specific facts demonstrating that a genuine dispute of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). For the evidence to present a "genuine" dispute of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the non-moving party. *Id*. at 255.

Rule 56 further provides that a

"party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c). When ruling on a summary judgment motion, "a court may also give credence to other facts supporting the movant, regardless of their source, if such facts are not challenged by the non-moving party because a failure to challenge proffered facts may render such facts 'admitted.'" *XVP Sports, LLC v. Bangs*, No. 2:11cv379, 2012 WL 4329258, at *4 (E.D. Va. Sept. 17, 2012); *see also* Fed. R. Civ. P. 56(c)(3) (noting a court "may consider other materials in the record").

As specified in Local Civil Rule 56(B), "the Court may assume that facts identified by the moving party in its listing of [undisputed] material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(B). The Court has construed the facts in the light most favorable to JCI and identified which material facts are, and are not, disputed.

## IV.   ANALYSIS

### A. JCI's Defenses

In its answer to plaintiffs' complaint, JCI pled the following defenses relevant to this motion:[11]  (1) "[Goodrich] and/or his employers possessed knowledge and awareness of the possible hazards resulting from exposure to asbestos which was equal to or exceeded any such knowledge possessed by JCI, and, therefore, the plaintiffs' claims are barred by the sophisticated user and/or purchaser defenses"; (2) "Plaintiffs' alleged damages and injuries were proximately caused by the superseding, intervening acts and conduct of others, thereby precluding plaintiffs from recovery from JCI"; and (3) if JCI is shown to have manufactured and supplied products to, or on behalf of, the United States government that Goodrich later used, then JCI is entitled to the same immunity as that of the United States government.[12]  ECF No. 10 at 9–10.

### 1.  The Sophisticated Purchaser/Sophisticated User Defense

JCI intends to offer evidence that purports to show that the Navy had sophisticated knowledge about the dangers posed by asbestos-containing products in order to demonstrate that the Navy was a sophisticated purchaser of such products, relieving JCI of its duty to warn. Plaintiffs argue that JCI should be precluded from offering such evidence in support of its

---

[11] JCI labeled these assertions "Affirmative Defenses." ECF No. 10-9 at 9.

[12] This is commonly known as the "government contractor" defense. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 510 (1988).

sophisticated purchaser defense,[13] because (1) the sophisticated purchaser defense is not available in maritime actions, and (2) JCI cannot prove the defense as a matter of law.   ECF No. 103 at 10–15.

The sophisticated purchaser defense flows from comment n of section 388 of the Second Restatement of Torts.  Section 388 addresses liability for failure to warn, and states that

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts, § 388 (Am. Law Inst. 1965).  Comment n to section 388 states that

> Chattels are often supplied for the use of others, although the chattels or the permission to use them are not given directly to those for whose use they are supplied. . . . In all such cases the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character.

---

[13] As will later be discussed, the multi-district litigation court with respect to asbestos matters has distinguished the sophisticated purchaser and sophisticated user defenses as two separate defenses. *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 339–40 (E.D. Pa. 2012).  That court did note, however, that some courts have referred to "sophisticated user" and "sophisticated purchaser" interchangeably. *Id.*  This is true of courts in the Fourth Circuit, and the parties do not distinguish between the two in their briefing.  The Court will here use the term "sophisticated purchaser," as one more accurately reflecting the Navy's role, but will rely on cases that use the term "sophisticated user." *See Mack*, 896 F. Supp. 2d at 341 (explaining that, under the sophisticated user defense, a manufacturer bears the burden of showing that the ultimate user (e.g., the seaman/employee) had sophisticated knowledge of the hazards, while under the sophisticated purchaser defense, a manufacturer bears the burden of showing that "it was reasonable for the manufacturer or supplier to rely on the intermediary to warn the ultimate end user").

Restatement (Second) of Torts, § 388, cmt. n.   Comment n also outlines factors a court is to consider when determining whether it was reasonable for a manufacturer to rely upon a third party to warn the ultimate user, such that the manufacturer is discharged of its own duty to warn.  These factors include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Id.*

### 2.  Superseding Causation and Proximate Causation

JCI argues that evidence of the Navy's knowledge and the Navy's own negligence is relevant to the issues of causation in this case.  ECF No. 115 at 12–17.  JCI advances two causation arguments regarding the Navy's alleged negligence.  JCI argues:  (1) its failure to warn was not a substantial cause of Goodrich's injury, because the Navy's negligent control of Goodrich's workplace environment was the real cause of Goodrich's injury; and (2) the Navy's intervening negligence in not providing a safe workplace superseded any negligence on JCI's part, severing liability.[14]  *Id.*  Plaintiffs contend that both arguments are simply alternate ways to state the superseding cause doctrine.  ECF No. 144 at 15–17.

The parties disagree as to whether superseding cause is an affirmative defense, or is merely one aspect of causation.[15]  *See* ECF No. 115 at 15; ECF No. 144 at 16.  An affirmative

---

[14] Both arguments assume that JCI had a duty to warn and failed to do so.

[15] According to plaintiffs, "it is not necessary for this Court to determine this issue at this time, because Plaintiffs' instant motion is a motion *in limine* to preclude evidence . . . , not to strike an affirmative defense."  ECF No. 144 at 16.  Now that the Court has determined that at least a portion of this motion should be treated as one to strike an affirmative defense, the Court must now determine this issue.

defense is "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiffs' or prosecution's claim, even if all allegations in the complaint are true." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)). Whether the superseding cause doctrine is treated as an affirmative defense or an aspect of causation differs by jurisdiction. *Compare Phillips v. Pneumo Abex, LLC*, 713 F. App'x 191, 195 n.3 (4th Cir. 2017) (applying North Carolina law and explaining that intervening negligence is "an extension of a plaintiff's burden of proof on proximate cause") (quoting *Clarke v. Mikhail*, 779 S.E.2d 150, 158 (N.C. App. 2015)) *with Atkinson v. Scheer*, 508 S.E.2d 68, 72 (Va. 1998) (explaining that, under Virginia law, the defendant has the burden of proof on his superseding cause defense).

The Court has already determined that maritime law applies to this action. *See* ECF No. 107 at 3–4. Applying such law, the Supreme Court of the United States has stated that the superseding cause doctrine "is one facet of the proximate causation requirement." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996). This is also the position taken in the most prominent treatise on the subject. 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3 (5th ed. 2017 Supplement) ("Another aspect of proximate causation is whether an intervening or superseding cause relieves the defendant of liability."). In response, plaintiffs cite several maritime cases that have treated the intervening negligence/superseding cause issue as an affirmative defense. ECF No. 144 at 16. *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 771 (5th Cir. 1989) precedes *Sofec* and is unpersuasive to the extent it conflicts with the above-quoted line. The Eastern District of Pennsylvania has also treated superseding cause as an affirmative defense in a maritime action, post-*Sofec*. *Filer v. Foster Wheeler LLC*, 994 F. Supp. 2d 679, 692 (E.D. Pa. 2014), as has the Western District of

Washington in *Moore v. The Sally J.*, 27 F. Supp. 2d 1255, 1263 (W.D. Wash. 1998). In neither of those cases, however, did the court provide any discussion or supporting reasoning for why it did so.

This Court will treat JCI's arguments regarding causation as applicable to the plaintiffs' burden of proof, rather than as an affirmative defense. For this reason, the parties' arguments about causation will be addressed in the accompanying opinion and order, rather than in this report and recommendation.

### 3. The Government Contractor Defense

Upon inquiry of the Court, JCI advised that it "is not asserting the government contractor defense in the instant case." Accordingly, no evidence should be admitted that is offered only to prove the government contractor defense, and the defense should be struck. The Court will address the sophisticated purchaser defense below.

### B. Plaintiffs' motion to exclude evidence of JCI's sophisticated purchaser defense should be granted, and that defense should be struck.

JCI intends to offer evidence of the Navy's knowledge regarding the hazards of asbestos to prove that the Navy was a sophisticated purchaser, relieving JCI of its independent obligation to warn. Plaintiffs argue that JCI should be precluded from offering such because (1) the sophisticated purchaser defense is not available in maritime actions, and (2) JCI cannot prove the defense as a matter of law. ECF No. 103 at 10–15. As previously stated, the Court will treat plaintiffs' motion as one for summary judgment on JCI's sophisticated purchaser defense, which is an affirmative defense.

16

In 2012, United States District Judge Eduardo C. Robreno, who has presided over the asbestos multi-district litigation ("MDL") in the Eastern District of Pennsylvania,[16] ruled that the sophisticated purchaser defense is unavailable, as a matter of law, in maritime cases. *Mack*, 896 F. Supp. 2d at 342–43. Judge Robreno first noted that the primary aims of maritime law are to (1) "protect maritime workers from the perils of working at sea," (2) "promote and protect maritime commercial activity," and (3) "promote uniformity in the law of the sea." *Id*. at 338–39. With these considerations in mind, and after surveying the mixed universe of cases with respect to the availability of a sophisticated purchaser defense, he determined that the defense was inconsistent with the aims of maritime law, because application of the defense would discourage work at sea and impair maritime commerce. *Id*. at 342–43. He also found relevant that the defense would leave Navy seamen without a remedy, due to application of the *Feres* doctrine that renders them unable to bring suit against the Navy.[17] *Id*. Accordingly, he found that the defense was unavailable in maritime actions.[18] *Id*.

Plaintiffs urge this Court to follow the MDL court's lead. ECF No. 103 at 10–11. Conversely, JCI argues that *Mack* was wrongly decided. ECF No. 115 at 6–8. It argues that the *Mack* decision did not adequately address the Navy's sophistication and specifications for

---

[16] The MDL court has handled over 180,000 asbestos cases since 1991. *See* U.S. District Court for the Eastern District of Pennsylvania, Asbestos Products Liability Litigation Statistics (2017), http://www.paed.uscourts.gov/documents/MDL/MDL875/MDL-875.aug31.2017.pdf (last visited 8/21/2018).

[17] *See Feres v. United States*, 340 U.S. 135, 146 (1950) (holding that the federal government is not liable under the Federal Tort Claims Act for injuries arising out of activities incident to military service).

[18] He did hold that the sophisticated user defense was available in maritime actions. *Mack*, 896 F. Supp. 2d at 342. As previously discussed, JCI is truly arguing a sophisticated purchaser defense. This is further supported by the lack of reliance by JCI on *Mack's* holding that a sophisticated user defense is available.

asbestos products and materials or the fact that the Navy controlled the work environments of its seamen. *Id.* at 7. JCI also questions whether the primary aim of maritime law is to protect and provide remedies for sailors. *Id.* at 7 n.3.

This Court need not go as far as plaintiffs suggest and rule that the sophisticated purchaser defense is unavailable in a maritime action. Under Fourth Circuit precedent, JCI has not demonstrated a genuine dispute of material fact such that a reasonable jury could return a verdict in its favor based on the defense. The Fourth Circuit addressed the sophisticated purchaser defense in *Oman v. Johns-Manville Corp.*, 764 F.2d 224 (4th Cir. 1985) and *Willis v. Raymark Indus.*, 905 F.2d 793 (4th Cir. 1990). In *Oman*, shipyard workers for Newport News Shipbuilding and Drydock Company brought suit in admiralty against numerous manufacturers of asbestos-containing products, claiming that the products they produced and sold to Newport News Shipbuilding caused the workers to contract asbestosis and related diseases. *Oman*, 764 F.2d at 226. The district court denied the manufacturers' request for a jury instruction regarding the defense, and the Fourth Circuit Court of Appeals affirmed. In doing so, the court of appeals applied the factors from comment n, stating:

> In this case the product, because it contained asbestos fibers, was very dangerous. The burden on the manufacturers in placing a warning on the product was not great. The employer was unaware of the danger until 1964. Finally, once the employer became aware of the potential danger it failed to convey its knowledge to its employees. We cannot say that the district court erred in refusing to give the charge requested by the manufacturers . . . .

*Id.* at 233.

In *Willis*, former employees of E.I. DuPont de Nemours and Company ("DuPont") brought suit against fourteen manufacturers of asbestos-containing materials, claiming that the manufacturers supplied those materials to DuPont without warning DuPont of the dangers presented by asbestos. *Willis*, 905 F.2d at 795. The district court did not allow the

manufacturers to present any evidence of the sophisticated user defense,[19] and the Fourth Circuit Court of Appeals affirmed. *Id.* at 797. In so holding, the court of appeals stated that the manufacturers "[did] not address one critical point: whether [the defendants] knew the extent of [the employer's] knowledge during or prior to the period of plaintiffs' exposure." *Id.* The Court continued, stating that the defendants "[could] not escape liability by reconstructing the past to show merely what the employer/purchaser knew." *Id.*

JCI argues that *Oman* and *Willis* are not proper reference points, and that the Court should instead focus on cases where the employer/third-party intermediary took an active role in designing the harmful product. ECF No. 115 at 8–11. JCI argues that the Navy actively participated in designing the gaskets manufactured by JCI. *Id.* Based on JCI's evidence, the Navy provided specifications for compressed asbestos sheet, MIL-A-17472. ECF No. 115-1. MIL-A-17472 specifies performance requirements, packing instructions, and materials to be used, including chrysotile asbestos fiber. *Id.* JCI admitted, however, in interrogatories that there was no intentional difference in the composition or packaging of the asbestos-containing products that JCI sold to private industrial consumers and those products sold to the United States Government. ECF No. 150-14 at 7. The fact that the Navy provided specifications that JCI's asbestos-containing products complied with is substantially different than the extent of the involvement by the purchasers of the products in the cases upon which JCI relies.

In *Fisher v. Monsanto Co.*, for example, an employee of Westinghouse Electric Corporation ("Westinghouse") contracted terminal brain cancer, allegedly caused by exposure to polychlorinated biphenyls ("PCBs") contained in a product called Inerteen, which was manufactured by Monsanto Company and sold to Westinghouse. 863 F. Supp. 285, 286–87

---

[19] While the court used the term "sophisticated user," the defense conformed with *Mack's* definition of "sophisticated purchaser." *Mack*, 896 F. Supp. 2d at 341

(W.D. Va. 1994).  The court, which used the terms "sophisticated user" and "sophisticated purchaser" interchangeably, found that Monsanto, the manufacturer, was entitled to summary judgment based on the sophisticated purchaser defense.  *Id.* at 287, 289.  The court found that Monsanto reasonably relied on Westinghouse to warn the ultimate users of the product because "[t]he record reflect[ed] that Westinghouse had 50 years' experience in working with chlorinated dielectric fluids for its machines *and developed* Inerteen."  *Id.* at 288 (emphasis added); *see also Baker v. Monsanto Co.*, 962 F. Supp. 1143, 1152 (S.D. Ind. 1997) ("Westinghouse developed Inerteen after seventeen years of its own research effort.").[20]

Further, there was evidence that Monsanto was aware of Westinghouse's sophistication with Inerteen specifically and relied on that sophistication.  For example, there was a 1959 letter from Monsanto to Westinghouse's Administrator of Industrial Hygiene warning of dangers associated with Monsanto products, including Inerteen, explicitly referencing "Westinghouse's 'some 20–25 years' experience with the products,'" and referencing specific Westinghouse employees who were experts.  *Baker*, 962 F. Supp. at 1153.  JCI has presented no evidence here that, even if the Navy had a sophisticated knowledge of the dangers of asbestos generally, or JCI's products specifically, at the time of Goodrich's employment, JCI had any awareness of that sophistication.

---

[20] An additional distinguishing factor in the cases involving Monsanto and Westinghouse pertains to the sixth factor from comment n, the burden imposed on the supplier to directly warn all users.  In *Fisher*, the Court noted that it was "impossible to label Inerteen, a liquid product, delivered in bulk."  *Fisher*, 863 F. Supp. at 289.  The *Baker* court similarly noted that "[t]here was no way for Monsanto to label directly the fluids it sold to Westinghouse."  *Baker*, 962 F. Supp. at 1153.  Nonetheless, the 55-gallon barrels that were delivered to Westinghouse did bear labels warning Westinghouse of the dangers associated with the fluids.  *Id.* at 1147.  Thus, despite the fact that Westinghouse designed Inerteen, Monsanto still undertook efforts to warn Westinghouse of the product's dangers.  It is undisputed that JCI undertook no efforts to warn the Navy of the potential hazards of its asbestos-containing products.  Nor does JCI argue that it would have been impracticable to place a warning on, for example, the individually-packaged gaskets it allegedly provided to the Navy.

JCI also relies on *Marshall v. H.K. Ferguson, Co.*, 623 F.2d 882 (4th Cir. 1980).  In *Marshall*, an employee of an Anheuser-Busch brewery "was severely burned by the emission of steam, hot water and hops from a spent hops conveyor when he opened the cleaning flap of the machine." *Id.* at 883.  The machine in question was manufactured by defendant H.K. Ferguson. *Id.* at 884.  Once again, the employer's level of involvement in the design of the product was greater than the Navy's in this case:  "[t]he brewing facility at Williamsburg was designed and constructed by Ferguson working jointly with technicians and engineers of Anheuser-Busch." *Id.*  More importantly, however, the court held that the plaintiff had not even demonstrated a design defect in the product.  *Id.* at 886 ("The undisputed facts of this case . . . place it outside the ambit of [section 388, because] there was nothing inherently dangerous in the [machine].").  Accordingly, there was nothing for Ferguson to warn about, and *Marshall* is completely inapposite to this case.

JCI also relies on *Amos v. BASF Corp.*, 1996 U.S. Dist. LEXIS 20604 at *17 (W.D. Va. July 15, 1996) (granting summary judgment on the defendant's sophisticated user defense).  Like the Monsanto/Westinghouse cases, "DuPont [the purchasing employer] invented and patented [the harmful product] and initially manufactured its own needs for the chemical," later deciding to instead purchase the product from the defendant.  *Amos v. BASF Corp.*, 125 F.3d 847 (Table), at *1 (4th Cir. Oct. 1, 1997).  Even more important, "DuPont assured [the defendant] that it 'possess[ed] the skill and expertise in handling, storage, transportation, treatment, use and disposal of [the harmful product], and it w[ould] inform and train its employees and its customers in the aforementioned skills and expertise." *Id.*  Thus, DuPont gave the defendant specific assurances that it would warn the ultimate user, which gave the defendant good reason to

rely on DuPont to so warn.   In this case, the Navy did not give JCI any such assurances, rendering this case far more similar to *Willis*.[21]

Finally, JCI relies on *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552 (W.D. Va. 1984), *aff'd*, 769 F.2d 213 (4th Cir. 1985).   The court in *Goodbar* held that the supplier of silica dust to a large factory that had extensive knowledge of the dangers of silicosis was entitled to summary judgment on its sophisticated user defense.   *Id.* at 566–67.   The court in *Goodbar* did not rest, however, on mere knowledge on the part of the employer.   *Id.*   For example, it also focused on the comment n factor of difficulty for the supplier to warn, noting, as in the cases previously discussed, that the product was delivered in bulk and therefore difficult to label for individual users.   *Id.* at 566.   Ultimately, although JCI suggests that *Goodbar* means a supplier need only demonstrate that the purchaser had sophistication and knowledge in order to prove the defense, *Goodbar* goes further and requires proof of a reason for the supplier to rely on the purchaser to warn the ultimate users.   *See Reibold v. Simon Aerials, Inc.*, 859 F. Supp. 193, 201 (E.D. Va. 1994) (distinguishing *Goodbar* and stating, "[w]hile the Court believes that [the purchaser] clearly is a sophisticated user of [the products], the facts presently before the Court are not sufficient to resolve the question of whether [the manufacturer] could reasonably rely on [the purchaser] to provide a warning to its employees").

In contrast to the cases noted above, the evidence before the Court is that JCI developed its own products.   JCI has stated that the composition of its asbestos-containing products sold to the United States government was not intentionally different than the composition of products it sold to non-governmental private industrial consumers.   ECF No. 144-8 at 25–26.   JCI stated in

---

[21] Additionally, the district court noted under the comment n factors that "Caprolactam generally does not pose a substantial danger to workers" and that BASF did in fact provide written warnings on the bags of Caprolactam flake. *Amos*, 1996 U.S. Dist. LEXIS 20604 at *20.

its responses to interrogatories that "[s]everal of Defendant's products met military and Federal specifications." *Id.* at 25. However, the fact that some JCI's products met specifications does not mean that the Navy took an active role in the development of such products. JCI has not presented a genuine dispute of material fact on this issue.

The cases cited by Goodrich provide more persuasive authority. First, *Willis* clearly stands for the proposition that JCI must not only show that the Navy knew of the dangers of asbestos during the relevant time period, but must also show that the defendant was aware of the Navy's knowledge and thus relied on the Navy to warn the ultimate users. *Willis*, 905 F.2d at 797; *see also Solly v. Manville Corp. Asbestos Disease Fund*, 966 F.2d 1454 (Table), *9 (6th Cir. 1992) ("it is irrelevant that defendant learned in hindsight that [the employer] may have been aware of a potential danger in exposure to defendant's product").

In addition to the relevant Fourth Circuit cases, many other courts have held that a defendant manufacturer seeking to rely upon the sophisticated purchaser defense must present evidence that it knew of the purchaser's knowledge regarding the dangers of the product in order to demonstrate that it reasonably relied on the purchaser to warn the ultimate user. *See In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 837–38 (2d Cir. 1992) (holding that the jury's verdict in favor of the plaintiffs was "unsurprising," given the lack of evidence that the defendants had actually relied on the Navy to warn its workers); *Cabasug v. Crane Co.*, 988 F. Supp. 2d 1216, 1228 (D. Haw. 2013) ("Defendants cannot take benefit of the sophisticated purchaser defense unless they can establish that they knew that the Navy was aware of the dangers of asbestos and that Defendants reasonably concluded that the Navy would provide warnings to its employees. . . . that the intermediary/employer is sophisticated is not, on its own, sufficient for this defense."); *Eagle-Picher Indus. v. Balbos*, 604 A.2d 445, 465 (Md. 1992)

(affirming trial court's denial of sophisticated purchaser jury instruction, because defendant manufacturer showed only that purchasing employer knew of the dangers of asbestos, but did not show that the manufacturer knew of the employer's knowledge).

JCI points to numerous documents intended to support its assertion that the Navy had knowledge of the dangers of asbestos prior to Mr. Goodrich's enlistment in the Navy in 1959. *See* ECF Nos. 151-18–151-26. JCI has provided no evidence, however, that it reasonably relied upon the Navy's knowledge and sophistication to provide warnings to the ultimate users of its products. Section 388 plainly states that a supplier of a dangerous item is subject to liability for failure to warn when the supplier "has no reason to believe that those for whose use the [item] is supplied will realize its dangerous condition." In other words, to avoid liability, the supplier must have some basis to believe that the ultimate user knows, or should know, of the item's hazards.[22] Plaintiffs argue that JCI cannot credibly argue that it relied on the Navy to provide warnings, because JCI maintains that it was not aware of the dangers of asbestos until after Goodrich's time in the Navy, and because it maintains that its sheet gasket and packing material did not require warnings. *See* ECF No. 144 at 12. The Court agrees. It is wholly inconsistent for JCI to claim, on the one hand, that it had no idea that its products were dangerous or required warnings, and to claim on the other hand that it knew the Navy knew that its products were dangerous and trusted the Navy to warn.

JCI also intends to use Captain McCloskey to testify that the Navy had extensive knowledge of the dangers of asbestos-containing products. Problematically for JCI in the context of this motion, McCloskey explains in her expert report that she intends to testify that the

---

[22] When JCI advanced this argument before the California Court of Appeals, that court stated that "[t]he fact that the user is an employee or servant of the sophisticated intermediary cannot plausibly be regarded as a sufficient reason, as a matter of law, to infer that the latter will protect the former." *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1297 (Cal. Ct. App. 2013).

24

Navy "did not consider asbestos-containing gaskets and packing to present a significant risk of exposure." ECF No. 114-15 at 6–7. This proffered testimony dramatically undercuts JCI's argument that it reasonably relied on the Navy to warn its employees of the dangers of asbestos-containing gaskets and packing.

A straightforward application of the comment n factors leads this Court to a similar conclusion as that reached by the Fourth Circuit in *Oman*. First, the gaskets, sheeting, and packing material at issue indisputably contained asbestos fibers, and thus were dangerous for the same reason the products in *Oman* were dangerous. Second, "[t]he burden on the manufacturers in placing a warning on the product was not great." *Oman*, 764 F.2d at 233. JCI packaged its asbestos-containing products to the Navy in the same packaging it provided to private consumers. ECF No. 150-14 at 7–8. There would have been no great burden to simply include a warning on the packaging. Third, the level of the Navy's sophistication regarding the dangers of asbestos is certainly contested, but it is uncontested that the Navy did not actually warn its employees. The fact that the Navy did not actually warn undermines JCI's argument that it reasonably relied on the Navy to do so under the fourth comment n factor (the reliability of the third party as a conduit of necessary information about the product). Moreover, as discussed above, JCI has not presented evidence from which a jury could reasonably infer that JCI reasonably concluded that the Navy would warn its employees during Goodrich's term of service.

For all of these reasons, there is no genuine dispute of material fact regarding the sophisticated purchaser defense, and plaintiffs are entitled to judgment on the defense as a matter of law. The Court recommends that JCI's sophisticated purchaser defense be struck.

## V.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Goodrich's motion *in limine*, which the Court has converted into a motion for partial summary judgment, ECF No. 72, be **GRANTED**. Specifically, the Court **RECOMMENDS** that summary judgment be **GRANTED** in plaintiffs' favor on JCI's sophisticated purchaser/user and government contractor affirmative defenses.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to    28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 24, 2018